IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AXIS SPECIALTY INSURANCE CORPORATION, | ) ) | |
| *Plaintiff*, | ) | |
| v. | ) | No. 07-C-5906 |
| | ) | |
| SIMBORG DEVELOPMENT, INC. | ) | Honorable David H. Coar |
| *Defendant*. | ) | |
| | ) | |
| SIMBORG DEVELOPMENT, INC. | ) | |
| *Counter-Plaintiff*, | ) | |
| v. | ) | |
| AXIS SPECIALTY INSURANCE CORPORATION, | ) ) | |
| *Counter-Defendant*. | ) | |

**MEMORANDUM OPINION AND ORDER**

Axis Specialty Insurance Corp. has sued Simborg Development, Inc., a policyholder, seeking declaratory judgment that: (1) Simborg's fire loss claim does not trigger or attach coverage under the Axis Policy, by virtue of the terms and conditions of the Axis Policy, and (2) the Court grant Axis other relief such as the Court deems fit and just under the circumstances. Simborg has counterclaimed, alleging breach of contract (Count I), vexatious delay in settling an insurance claim under the Illinois Insurance Code, 215 ILCS 5/155 (Count II), misrepresentation under the Illinois Insurance Code, 215 ILCS 5/154, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1. The parties have filed cross motions for summary judgment, with Axis seeking judgment in its favor on its Complaint for Declaratory Judgment and on Count I of Simborg's Counterclaim, and Simborg seeking judgment on Counts I and II of its Counterclaim.

1

# FACTS[1]

Simborg has fifty four properties in Illinois, Indiana, and Wisconsin, insured under a two-layered property insurance program in which two insurers provide coverage above Simborg's $25,000 deductible. The first $10 million in coverage established under a policy provided by Nutmeg Insurance Company. The Axis Policy provides an additional layer of recovery of up to $10 million per occurrence in excess of the $10 million limit of the Nutmeg Policy and Simborg's $25,000.[2]

Simborg obtained the policy by using the services of JMB Insurance Agency, Inc. ("JMB"). JMB was responsible for acquiring Simborg's insurance, including its property insurance. In seeking excess coverage, JMB contacted Maximum Independent Brokerage, a wholesale representative that binds coverage on behalf of Axis, and forwarded a document compiled by Mitchell Simborg, President of Simborg, entitled "Building and Financial Information" (the "BFI Sheet"), along with a property insurance proposal. The BFI Sheet listed individual building and content replacement values for Simborg's fifty four properties, and also listed the total value of all of Simborg's properties as $137 million. Among other properties, the BFI Sheet listed a total building and contents value of $6 million for the Halsted Industrial Centre Partnership in Harvey, Illinois (the "Halsted Site").

Axis provided a quote and a revised quote for Simborg's excess insurance policy to Maximum. When the quote was accepted, Axis issued a binder confirming coverage which stated "Scheduled Limit of Liability applies." Maximum incorporated the Axis binder into its own set of forms, and therefore retained this wording. The Axis Policy was thereafter issued,

---

[1] The facts listed below are either undisputed or deemed admitted by the parties because their Local Rule 56.1 materials inappropriately denied the material fact by citing to an exhibit that agreed with the other party's statement of material facts.

[2] The Axis Policy's $10 million limit applies to all of Simborg's properties with the exception of a single property located in Munster, Indiana, for which the limit is $25 million.

2

and included a document entitled Endorsement A, the Excess Scheduled Limit of Liability Endorsement (the "Axis Endorsement"). Coverage was provided in the amount of $10 million per occurrence for loss or damage between December 31, 2006 and December 31, 2007. The sole exception to these limits was the 9200 Calumet Avenue location in Munster, Indiana, for which the Axis Policy provided a limit of $25 million. Axis charged Simborg a $35,000 premium for the Axis Policy, though the parties dispute how this amount was determined.

On or about May 24, 2007, a fire caused significant damage to Simborg's buildings located at the Halsted Site. The incident was reported to Axis on or about May 30, 2007. Axis issued a letter to Simborg on July 11, 2007, that purported to reserve its rights in relation to Simborg's claim. On August 2, 2007, Axis received an estimate to repair the Halsted Property, prepared by Andersen Group International, of $22,823,427.24, which did not include the cost of debris removal, value of the building contents destroyed or damaged by the fire, or any estimate of lost rents or other expenses. On August 17, 2007, Simborg notified Axis that Nutmeg had paid out its entire $10 million on the underlying policy limits and requested that Axis fulfill its own policy obligations. On September 18, 2007, Axis denied Simborg's claim, stating that under the Axis Endorsement, the Policy was not attached by the fire loss. On October 18, 2007, Axis filed the instant Complaint for Declaratory Judgment.

**LEGAL STANDARDS**

A. Summary Judgment

A party seeking summary judgment has the burden of showing that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56. When reviewing a motion for summary judgment, the court will "view all facts and draw all inferences in the light most favorable to the non-moving party." *Chortek v. City of Milwaukee,* 356 F.3d

740, 745 (7th Cir. 2004). Once a summary judgment motion has been filed, the non-moving party must show through specific evidence that a triable issue of fact remains on issues it bears the burden of proof at trial. *Liu v. T & H Machine, Inc.,* 191 F.3d 790, 797 (7th Cir. 1999). A party must "present more than mere speculation or conjecture to defeat a summary judgment motion." *Sybron Transition Corp. v. Security Ins. Co. of Hartford,* 107 F.3d 1250, 1255 (7th Cir. 1997). Summary judgment is appropriate if the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial. *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

## ANALYSIS

A. Breach of the Insurance Contract

　　1. Excess Scheduled Limit of Liability Endorsement

When interpreting insurance policies, "a court's primary objective is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy." *Cent. Ill. Light Co. v. Home Ins. Co.,* 821 N.E.2d 206, 218 (Ill. 2004). Whether an insurance policy is ambiguous is a question of law. *See Bohner v. Ace American Ins. Co.,* 834 N.E.2d 635, 638 (Ill. App. 2005). The Court is not to adopt a "strained, forced, unnatural, or unreasonable construction, or one which would lead to an absurd result." *U.S. Fire Ins. Co. v. Hartford Ins. Co.*, 726 N.E.2d 126, 128 (Ill. App. 2000). Words are ambiguous only if they are susceptible to more than one reasonable interpretation. *USF&G v. Wilkin Insulation Co.*, 578 N.E.2d 926, 930 (Ill. 1991). Furthermore, extrinsic evidence is admissible to interpret the terms of an insurance

policy only when the language itself is ambiguous. *See Lee v. Allstate Life Ins. Co.*, 838 N.E.2d 15, 23 (Ill. App. 2005). If the terms of the insurance policy are clear and unambiguous, a court must give effect to the plain meaning, but if the terms are susceptible to multiple interpretations, a court must construe them in the light most favorable to the insured. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 607 N.E.2d 1204, 1212 (Ill. 1992).

Simborg contends that the terms of the Axis Policy were ambiguous because the Axis Endorsement can be interpreted as establishing either scheduled coverage, limiting liability to the lesser of the individually stated value of its insured properties or $10 million, or blanket coverage, allowing for a $10 million recovery per occurrence.

The Axis Endorsement includes the following relevant terms:

1. In the event of a loss hereunder, liability of the Company shall be limited to the least of the following:

    A. The actual adjusted amount of loss, less applicable deductible(s) or self-insured retention

    B. 100% of the individually stated value for each scheduled item of property, time element, or other coverages shown on the latest Application or Statement of Values on file with the Company, less applicable deductible(s) or self-insured retention(s)…

Furthermore, the Axis Policy requires the exhaustion of the "Limit of Liability" under the Nutmeg Policy before the Axis Policy is attached. Because the limit of liability under the Nutmeg Policy is $10 million, it must be exhausted in that amount for the Axis Policy to apply. However, the Axis Endorsement also states that the Nutmeg Policy is only considered exhausted when $10 million in damages *which would have been covered under the terms of the Axis Policy* is sustained and paid for by Nutmeg.

Axis, relying on section 1.B, argues that its policy unambiguously limits its liability to the "individually stated value" for each item of property on the Schedule of Values. Because the

5

individually stated value for the Halsted Site was $6 million, Axis argues that the Nutmeg Policy was not exhausted, and the Axis Policy is therefore not triggered. Simborg, on the other hand, argues that the language of section 1.B is ambiguous, and therefore must be construed in its favor as limiting Axis's liability to the total value of its properties, $137 million. If Simborg's interpretation is correct, it would be entitled to recover the $10 million maximum policy value because the Nutmeg Policy has been exhausted. Simborg points to a variety of extrinsic evidence to buttress its argument. Under *Lee*, this Court must first consider whether the policy terms are indeed ambiguous before considering the extrinsic evidence. 838 N.E.2d at 23.

Simborg first cites *Berkshire Refrigerated Warehousing LLC v. Commercial Underwriters Ins. Co.,* 2006 WL 862877 (N.D. Ill. Mar. 27, 2006), in support of its argument that the Endorsement is ambiguous. However, that decision is inapposite. The disputed provision there limited coverage to "[t]he total stated value for the property involved, as shown on the latest Statement of Values on file with the Company…" *Id.* at *2. However, the parties in *Berkshire* had already agreed that the coverage was blanket, and instead disputed whether "total" referred to the building, contents, and business income value for each location, versus just the building value. The court pointed out that "the word 'total' suggests that the term contemplates reference to a sum of more than one 'stated value,'" and found in favor of the insured. *Id.*

Here, there exists no such facial ambiguity. Simborg tries to argue that the word "each" is analogous to the word "total." However, as Simborg itself notes, the Illinois Supreme Court has defined "each" to mean every one of the two or more individuals composing the whole, *considered separately from the rest*. *Orr v. Edgar,* 670 N.E.2d 1243, 1249 (Ill. App. 1996). Thus, even if we were to substitute Simborg's suggested language for the word "each," the Axis Endorsement would still establish a scheduled limit of liability policy because it requires the

6

property values to be considered on an individual basis. Such an interpretation is further supported by the Endorsement's specific mention of the "*individually stated value* for each scheduled item of property..." This term unambiguously requires the value for a scheduled item of property to be considered individually, without regard to the total value of all of Simborg's properties. In order for the Axis Endorsement to create a blanket policy, the reference to the "individually stated value" of an item of property must be completely eliminated, and even then, the word "each" suggests an individual property should be considered separately. *See Orr,* 670 N.E.2d at 1249. Illinois law prohibits this Court from adopting such a strained reading of the policy terms, and the plain language of section 1.B unambiguously establishes a scheduled liability policy. See *U.S. Fire Ins. Co.,* 26 N.E.2d at 128.

Furthermore, Axis correctly points out that another court has found the exact language used in the Axis Endorsement to be unambiguous. *See Knowlton v. Specialty Papers, Inc. v. Royal Surplus Lines Ins.,* No. 03 Civ. 705 slip op. at 4-5 (N.D.N.Y. Oct. 14, 2003) (the "plain and unambiguous effect of the endorsement," which limited liability to "100 percent of the individually stated value of each scheduled item of property insured as shown on the latest statement values on file with the company," was to establish scheduled coverage); *see also Core-Mark Int'l Corp. v. Commonwealth Ins. Co.,* 2006 WL 2501884 (S.D.N.Y. Aug. 30, 2006) ("[T]he policy at issue [in *Knowlton*] unambiguously established scheduled coverage."). Although Simborg points out that *Core-Mark* was not decided under Illinois law, the legal issue of whether the provision was ambiguous required applying the same principles of construction as Illinois. Because the language of the Axis Endorsement unambiguously establishes a scheduled limit of liability policy, Simborg's extrinsic evidence is irrelevant and need not be considered.

7

Finally, Simborg, citing several cases decided under the law of states other than Illinois, argues that regardless of the language of the Axis Endorsement, it should be read to provide blanket coverage on public policy grounds because its coverage would otherwise be rendered illusory. Simborg contends that if the Axis Endorsement establishes a scheduled limit of liability policy, it would only lead to coverage of four of Simborg's fifty four properties even though Simborg's premium was based on coverage of all of the properties. Although Simborg acknowledges Axis's position that coverage would be available in the event of an occurrence that impacted multiple locations, such as a tornado, fire, or heavy snow causing roof damage, it contends that such an occurrence would be exceedingly unlikely due to the Midwestern location of Simborg's properties and because the Axis Policy excludes coverage for losses due to terrorism, earthquake, and flood. Under Illinois law, courts must not construe insurance provisions in a manner leading to an absurd result. *U.S. Fire Ins. Co.,* 726 N.E.2d at 128. Because many of Simborg's properties are located in close proximity to one another, the possibility of an event impacting multiple locations is not as farfetched as Simborg contends. Furthermore, phenomena such as heavy snow and tornadoes are not uncommon in Midwest. Therefore, Simborg is unable to meet its burden in arguing that the plain language of the policy should be ignored in favor of establishing blanket liability.

  2. Statement of Values

Given that the Axis Endorsement is unambiguous, the next issue is whether the Building and Financial Information Sheet is the Statement of Values to which the Axis Endorsement refers. There is no legitimate dispute of fact with regard to this issue, as Renee McGovern, the JMB account executive for Simborg, testified that the BFI Sheet was the Schedule of Values to which the Axis Policy refers. Numerous e-mail communications between JMB, Maximum, and

Axis, referring to the BFI Sheet as a "Statement of Values," "Schedule of Values," or "SOV," support her testimony. Although Simborg argues that both JMB and Maximum are unqualified to make legal determinations as to the specific terms of Simborg's policy, the employees involved in placing coverage would have been aware of whether the BFI Sheet was the Statement of Values to which the Axis Policy refers.

Simborg argues that the BFI Sheet's reference to a "Blanket Building/Contents Limit" contradicts a Statement of Value's purpose as supplementing a scheduled limit of liability policy. Simborg cites the following definition of blanket limit:

> A single limit of insurance that applies over more than one location or more than one category of property coverage, or both. This is in contrast to specific or scheduled limits of insurance, which are separate limits that apply to each type of property at each location.

International Risk Management Institute, Inc.'s Glossary of Insurance and Risk Management Terms. In Simborg's view, the term "Blanket Building/Contents Limit" indicates that the document was to be used in establishing a blanket liability policy. According to Axis, the "Blanket Building/Contents Limit" term indicates that the limit of insurance for a particular location is a blanket value consisting of the building replacement cost plus the value of the building's contents. This is indeed a "single limit of insurance that applies over … more than one category of property coverage," and is thus consistent with the definition of blanket limit advanced by Simborg. Furthermore, "Blanket Building/Contents Limit" appears as the heading to a column on the BFI Sheet that includes the sum of the building and contents values for each of the fifty four Simborg properties. Therefore, the term does indeed serve the purpose of establishing the total value of an individual property, and does not in any way indicate that the BFI Sheet was to be used in seeking a blanket liability policy.

9

Simborg also argues that the "usual and customary practice" is for a Statement of Values to be reviewed and signed by the policyholder. However, Simborg did indeed review the document, as Mitchell Simborg, the President of Simborg, was himself responsible for compiling the document. Furthermore, the Axis Policy only requires that the SOV be "on file," and this condition was satisfied. Although an Axis underwriter testified that the most recent version of a policyholder's Statement of Values is typically marked "binding," the dispute here does not center on which *version* of the BFI Sheet was controlling, but rather whether the BFI Sheet was on file with the company at all. Furthermore, the underwriter never testified that a Statement of values *must* be marked "binding" to be considered properly on file. Therefore, there is no triable issue of fact as to whether the BFI Sheet is the Statement of Values to which the Axis Endorsement refers.

Because the Axis Endorsement establishes a scheduled limit of liability policy, Simborg is entitled to no recovery in this case. Simborg's motion for summary judgment on Count I is consequently DENIED and Axis's motion for judgment in its favor on its Complaint for Declaratory Judgment is GRANTED.

B. Simborg's Remaining Claims

Because Simborg was not entitled to recovery on the Axis Policy, its motion for summary judgment on Count II is DENIED as moot.

## CONCLUSION

For the foregoing reasons, Axis's motion for judgment in its favor on its Complaint for Declaratory Judgment is GRANTED. Simborg's motion for summary judgment on Counts I and II of its Counterclaim is DENIED.

    Enter:

    /s/ David H. Coar

    _____
    David H. Coar
    United States District Judge

Dated: **March 20, 2009**